**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **STAPLES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | CIV.ACT. No. 3-07-CV-0928-K |
| | § | |
| **ALAN SANDLER,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Respectfully submitted,

**DAVID, GOODMAN & MADOLE,**
A Professional Corporation

By:   <u>/S/   Brett Myers</u>
        Brett L. Myers
        State Bar No. 00788101
Two Lincoln Centre
5420 LBJ Freeway, Suite 1200
Dallas, Texas  75240
972/991-0889
972/404-0516 Telecopier

ATTORNEYS FOR DEFENDANT

## TABLE OF CONTENTS

Table of Contents ............................................................................................. i

Index of Authorities ....................................................................................... ii

Summary of the Motion for Summary Judgment ...................................... 1

Facts Supporting Motion for Summary Judgment .................................... 2

Argument and Authorities .............................................................................. 9

      A.  Summary Judgment Standard ................................................ 9

      B.  Staples' Breach of Contract Claims ................................... 10

      C.  Staples' Fiduciary Duty Claims ......................................... 11

      D.  Staples Claims for Misappropriation of Trade Secrets ....... 13

      E.  Staples Tortious Interference Claims ................................. 14

      F.  Staples Fraud and Negligent Misrepresentation Claims ....... 16

      G. Staples Conversion Claims ................................................ 17

Conclusion ...................................................................................................... 18

Certificate of Service .................................................................................... 18

## INDEX OF AUTHORITIES

**Cases:**

*Abetter Trucking Co. v. Arizpe*;
113 S.W.3d 503, 510 (Tex.App.-Houston [1 Dist.] 2003 no writ). ...................................13

*Avera v. Clark Moulding*,
791 S.W.2d 144, 145 (Tex.App.-Dallas 1990, no writ) ...................................................14

*Browning-Ferris, Inc. v. Reyna*,
865 S.W.2d 925, 927 (Tex.1993) .........................................................................................15

*COC Servs., Ltd. v. CompUSA, Inc.*,
150 S.W.3d 654, 670 (Tex.App.-Dallas 2004, pet. denied) ...............................................15

*Herider Farms-El Paso, Inc. v. Criswell*,
519 S.W.2d 473, 476-77 (Tex.Civ.App.-El Paso 1975, writ ref'd n.r.e.) ........................13

*IKON Office Solutions v. Eifert*,
125 S.W.3d 113, 124 (Tex.App.—Houston [14 Dist.] 2003, pet. denied) ......................16

*John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*,
17 S.W.3d 721, 730 (Tex.App.-Austin 2000) ...................................................................15

*Johnson v. Brewer & Pritchard, P.C.*,
73 S.W.3d 193, 200 (Tex.2002) ..........................................................................................13

*Johnston v. American Speedreading Acad., Inc.*,
526 S.W.2d 163 (Tex.Civ.App.-Dallas 1975, no writ) .....................................................13

*Ledel v. Bill Hames Shows, Inc.*,
367 S.W.2d 182 (Tex.Civ.App.-Fort Worth 1963, no writ) .............................................13

*M P I, Inc. v. Dupre*,
596 S.W.2d 251, 254 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.) ........................13

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*,
991 S.W.2d 787, 791 (Tex. 1999) .......................................................................................17

*Sheshunoff Management Services, L.P. v. Johnson*,
209 S.W.3d 644 (Tex. 2006) ...............................................................................................10

*Southwestern Bell Tel. Co. v. John Carlo Texas*,
843 S.W.2d 470, 472 (Tex.1992) ........................................................................................15

*Spoljaric v. Percival Tours, Inc.,*
708 S.W.2d 432, 434 (Tex. 1986)....................................................................16

*United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,*
865 S.W.2d 214, 222 (Tex. App.-Waco 1993, writ denied).............................17

**<u>Rule</u>**:

Fed. R. Civ. P. 56(c). .........................................................................................9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **STAPLES, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | CIV.ACT. No. 3-07-CV-0928-K |
| | § | |
| **ALAN SANDLER,** | § | |
| | § | |
| **Defendant.** | § | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendant Alan Sandler moves for summary judgment on each of Plaintiff Staples, Inc.'s claims against him.

**SUMMARY OF THE MOTION**

Sandler was a sales associate Staples selling office supplies until he voluntarily resigned on February 22, 2007.  After Sandler resigned, he went to work for Preferred Office Products as a commissioned sales employee selling office supplies.

Staples claims that Sandler violated a noncompete by going to work for Preferred Office Products, Inc., but the noncompete signed by Sandler when he went to work for Staples is unenforceable under Texas law because the noncompete agreement it is not ancillary to or part of an otherwise enforceable agreement.   Accordingly, Sandler is entitled to summary judgment on Staples breach of contract claim.

Staples claims that Sandler breached a duty of good faith and fair dealing and that Sandler misappropriated Staples' trade secrets, but Sandler has not used or disclosed any confidential or proprietary information belonging to Staples.   Since Sandler has not used or

disclosed any of Staples' confidential or proprietary information, Sandler has not breached any duties to Staples or misappropriated any trade secrets belonging to Staples.

Staples claims that Sandler somehow defrauded Staples or negligently misrepresented his true intentions when he went to work for Staples, but Sandler's summary judgment evidence establishes that Sandler believed every statement he made to Staples at the time Staples hired him.

Staples also claims that Sandler converted Staples' property, but Sandler did not take, and does not have, any tangible property that belonged to Staples.

Staples claims that Sandler tortiously interfered with Staples' customers.  However, Sandler has not caused any customer to terminate its relationship with Staples.  Moreover, absent an enforceable noncompete, the Texas constitution guarantees an employee the right to compete with his former employer.

## FACTS SUPPORTING MOTION FOR SUMMARY JUDGMENT

Concurrently with this Memorandum, Sandler has filed Defendant's Appendix in Support of Defendant's Motion for Summary Judgment.  The Appendix consists of true and correct copies of deposition excerpts from the Deposition of Alan Sandler, the Deposition of Andrew Atkinson, the deposition of Lee Durdin, the Deposition of Bruce Kamis, and the Deposition of Gus Kamis.  Sandler incorporates the deposition excerpts in their entirety.

In support of his motion for summary judgment, Sandler relies upon the following undisputed facts:

**A.      Sandler's Employment History.**

1.        Sandler has sold office supplies for over 20 years in Dallas, Texas.  (Defendant's App. 4).  He began his career at Johnson Ribbon in 1987.  (Defendant's App. 4).   Johnson

Ribbon was purchased by Prime Office Products.  Sandler continued to work for Prime selling office supplies until Prime was purchased by Staples in 2005.  (Defendant's App. 5-6).  In 2005, Prime was purchased by Staples, and Sandler became a Staples employee in March 2006. (Defendant's App. 7-8, 15).

2.      Sandler has an excellent reputation in the office supply business in Dallas. (Defendant's App. 109-11, 124, 126, 145-46, 164).

3.      When Sandler became a Staples employee in March 2006, Sandler executed a "Noncompetition Agreement" and a "Confidentiality Agreement."  (Defendant's App. 5).[1]  At the time he executed these agreements, Sandler fully expected his employment at Staples to be mutually successful for both parties.  (Defendant's App. 8-11).  After Sandler executed the Noncompetition Agreement, Staples did not provide Sandler with any sales training.  In fact, Sandler's customers remained on the same pricing scheme that the customers had been on at Prime.  (Defendant's App. 49-52).  Staples' pricing strategy consisted of "get as much as you can" for the product.  (Defendant's App. 52).  Sandler cannot recall receiving any information unique to Staples, or that he did not already know about because of his length of time in the office supply business.  (Defendant's App. 53, 58).  Staples did not teach or provide Sandler with anything new about the customers that Sandler had been servicing for years prior to going to work for Staples.  (Defendant's App. 57).

_____

[1]      The Non-Compete and Non-Solicitation Agreement and Proprietary and Confidential Information Agreement that Sandler signed when he went to work for Staples in March 2006 are attached to the Sandler deposition as Exhibit 4, and are contained in the Appendix as pages _____.

**B.    Sandler becomes frustrated with Staples.**

4.    At Staples, Sandler sold office products, just like he did at Johnson Ribbon and Prime.  However, Staples way of doing business was materially different than what Sandler had been used to at Johnson Ribbon and Prime.  Sandler was unable to provide his customers with the same level of personal service that he had been able to provide in the past.  (Defendant's App. 150-51).  Sandler also began experiencing problems with the way Staples was handling his long standing customers that he had been servicing since he began selling office products at Johnson Ribbon.  One of Sandler's biggest customers intimated to Sandler that it was planning on leaving Staples, regardless of whether Sandler remained employed at Staples.  (Defendant's App. 25-29, 30-31).  In general, Sandler's customers were not happy with Staples.  (Defendant's App. 42).

5.    Sandler also became dissatisfied with Staples' compensation scheme.  When Sandler became a Staples employee, a major factor for Sandler joining Staples was Staples' assurances that Sandler's compensation would remain the same.  Sandler specifically raised these concerns with Staples employees Steve Mongeau, Paul Bodley and Neil Ringel, who assured Sandler that they "would take care of" Sandler and that their "first concern [was] to make sure that [Sandler] and [his] family are taken care of."  (Defendant's App. 16-17).  By November 2006, Sandler began to understand that his compensation would go down from where it was at Prime.  Sandler concluded that the representations Staples had made to him about what his work would be like at Staples were false.  If Sandler had known that Staples' representations were false, and that his compensation would decrease, he never would have gone to work for Staples in the first place.  (Defendant's App. 9-10, 14-15).

6.      Sandler decided to leave Staples in February 2007.  (Defendant's App. 112-13).

Sandler gave his notice of resignation to Staples on February 9, 2007, and his last day of work at

Staples was February 23, 2007.  (Defendant's App. 12-13).  When Sandler left Staples, Sandler

did not take, and does not have any documents or any other tangible personal property belonging

to Staples.  (Defendant's App. 23-24, 32, 35-39).  In all, Sandler worked for Staples for less than

one year of his 20 year career in the office supply business.  When Sandler gave his resignation

notice to Staples, Sandler had not decided where he would go to work after his employment at

Staples ended.  Since Sandler did not know where he was going to work after he left Staples,

Sandler did could not have solicited any business from any Staples customers for Preferred while

Sandler was still employed by Staples.  (Defendant's App. 21-22, 29, 43-45, 47-48, 90-91).

**C.      Sandler's employment with Preferred.**

7.      In mid to late January or early February 2007, Sandler met Lee Durdin for lunch.

(Defendant's App. 17, 59, 105-106).  Sandler had known Durdin for years because Durdin was a

sales person for Preferred Office Products, and the two had been competing against one another

for customers for the past several years.  (Defendant's App. 108-09,124)  Additionally, Sandler

and Durdin were members of the Association of Legal Administrators ("ALA"), and together

had planned the annual ALA golf tournament in September 2006.  (Defendant's App. 106-111-

12).   Durdin and Sandler decided to go to lunch together to catch up on one another's lives.

(Defendant's App. 107-08, 112-14).  During the lunch meeting, Durdin asked Sandler how

things were going for Sandler at Staples.  Sandler mentioned to Durdin that he was frustrated

with Staples' way of doing business.  (Defendant's App. 115-118).  Sandler and Durdin did not

discuss Staples' customers, or any specific details of Sandler's frustrations.  (Defendant's App.

119-20).   They did not discuss specific details about Sandler's employment at Staples, or

potential employment at Preferred.   (Defendant's App. 125-26).   Durdin told Sandler that if Sandler was looking to make a change, Preferred would love to have Sandler come aboard. (Defendant's App. 113-14).   Sandler told Durdin that he did not know what he was going to do, and that he had been looking into other opportunities for employment outside the office products business. (Defendant's App. 17-19).

8.     When Durdin got back from lunch, he mentioned to his supervisor Andrew Atkinson that Durdin had met Sandler for lunch and that Sandler was frustrated with the way things were going at Staples.  (Defendant's App. 76-77, 121-123).   Atkinson was one of three owners of Preferred, and the vice president in charge of marketing.  (Defendant's App. 71-72). Atkinson had known Sandler for 15 years, and he was familiar with Sandler's reputation in the office supply business in Dallas.  (Defendant's App. 75, 89).

9.     Atkinson and Durdin met with Sandler in early February 2007 for coffee. (Defendant's App. 78-79).  At this meeting, Sandler and Atkinson discussed personal matters. (Defendant's App. 78-79, 82).  They did not discuss Sandler's customers at Staples, or whether any of Sandler's existing customers would follow him to Preferred.  (Defendant's App. 80, 82). Sandler mentioned that his job at Staples was not what he had been used to at Prime. (Defendant's App. 81).  After the meeting, Atkinson went back to Preferred and mentioned to the other two owners of Preferred, Gus and Bruce Kamis, that he had met Sandler and that there might be a chance to bring Sandler on board at Preferred.  (Defendant's App. 82).[2]   All three agreed that Sandler would be a great addition to Preferred's sales force.  (Defendant's App. 83, 173-74, 177).

---

[2] Gus Kamis is the president of Preferred Office Products.  Bruce Kamis is the vice president of operations.  (Gus Kamis depo. 15-16; Bruce Kamis depo. 9).

10.     A couple of days after meeting with Atkinson and Durdin, Sandler met with Atkinson, Gus and Bruce Kamis.  The purpose of the meeting was so that Sandler and the Kamises could get to know one another.  (Defendant's App. 91-92, 145-46, 148-150, 170-72, 175-76).  At the meeting, Sandler asked whether Preferred was going to sell out to another company.  (Defendant's App. 149).  Sandler asked about Preferred's way of doing business. Preferred did not make Sandler a job offer, or discuss compensation with Sandler, or discuss Sandler's employment at Staples or Sandler's customers at Staples.  (Defendant's App. 59-60, 86-88, 100, 147-48, 151-52, 181-82).  Preferred did not offer Sander a job, or set a specific time frame for deciding to bring Sandler on board.  (Defendant's App. 88, 177).  Preferred did not anticipate that Sandler would bring a lot of business from Staples.  (Defendant's App. 96). Sandler explained that he would have to discuss going to work for Preferred with his wife. (Defendant's App. 84-85).  The meeting concluded with Sandler telling Atkinson, Gus and Bruce Kamis that if Sandler showed up at Preferred, then Sandler would be working for Preferred. (Defendant's App. 45, 47, 88, 45, 47, 173, 178-79).

11.     This meeting between Sandler, Atkinson, Gus and Bruce Kamis was the last time Atkinson, Gus and Bruce heard from Sandler before Sandler came to work for Preferred. (Defendant's App. 88).  After the lunch meeting, Atkinson and Bruce Kamis briefly discussed whether either had heard from Sandler.  Neither had heard further from Sandler after the meeting, and both wondered whether Sandler was coming to work at Preferred.  (Defendant's App. 90).  Aside from Atkinson and Bruce Kamis briefly speculating whether Sandler would come to work at Preferred, there were no other discussions among Preferred's management about Sandler coming to work for Preferred.  (Defendants' App. 89-90, 159).

12.     On February 26, 2007, Sandler showed up to work at Preferred.  (Defendant's App. 97).  Sandler's arrival at Preferred was somewhat unexpected for Preferred.  Preferred never had extended Sandler a job offer.  On the morning of Sandler's first day of work, Preferred had to scramble to set up a work station for Sandler because no one knew that Sandler would be starting on the day that he showed up for work.  (Defendant's App. 98-99, 156-63).

13.     Prior to going to work for Preferred, Sandler did not discuss with anyone at Preferred the customers that Sandler worked with while he was employed by Staples.  Sandler did not discuss with anyone at Preferred the amount of business Sandler thought he could bring with him from Staples.  Sandler did not discuss anyone at Preferred any customers that Sandler thought would follow him to Preferred.  (Defendant's App. 40, 46, 127-30, 136-37, 151-52).

14.     After going to work for Preferred, Sandler did not use or disclose to anyone any information he acquired because of his employment at Staples.  (Defendant's App. 56, 127-30, 153-55).  No one at Preferred ever asked Sandler if he had confidential or proprietary information belonging to Staples.  (Defendant's App. 41).  In fact, any information that Sandler may have had access to at Staples was available within the industry to anyone who went looking for it.  (Defendant's App. 128-30).  For example, through its membership in the buying group Trimega, Preferred is able to find out Staples' cost of goods sold.  (Defendant's App. 129-32).  Also, the key piece of information that Preferred needs to compete with its competitors is the price the competitors charge the customers.  Customers regularly give out pricing information to try to obtain the best possible price.  (Defendant's App. 54-55, 73-74, 132-35, 141).  More importantly, the customer ultimately decides from whom it is going to purchase office supplies.  (Defendant's App. 93-95).

15.     Sandler does not have an advantage over other similarly situated persons with similar sales backgrounds as Sandler.  Sandler cannot remember the margins for the items he sold on behalf of Staples.  (Defendant's App. 34-35, 54).  Since going to work for Preferred, Sandler has increased his sales at a rate consistent with would one would expect from a sales associate with Sandler's experience in the office supply business.  (Defendant's App. 101-02, 138-40, 180-81).

16.     The only customers that Sandler has solicited on behalf of Preferred are the long-term customers to whom Sandler had sold office supplies while he worked at Johnson Ribbon and Prime.  (Defendant's App. 32-33).  While at Preferred, Sandler has not sold any office products to any customer that Sandler had not previously done business with for years prior to Sandler going to work for Staples.  Sandler has not attempted to make any sales to any customers about whom Sandler gained knowledge because of Sandler's employment at Staples.  As far as Sandler's customers were concerned, they did not intend to remain Staples customers after Sandler left Staples.  (Defendant's App. 21-22, 183-84).

## ARGUMENTS AND AUTHORITIES

### A.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the facts and law as represented in the pleadings, affidavits, and other summary judgment evidence show that there is no genuine issue about any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The undisputed summary judgment evidence conclusively establishes that Sandler is entitled to summary judgment on Staples' claims for breach of contract, breach of fiduciary duty, misappropriation of trade secrets, confidential, and proprietary information,

tortious interference with contracts and business relationships, fraud and/or negligent misrepresentation, and conversion. No reasonable fact finder could possibly conclude otherwise.

### B.     Staples' breach of contract claims

Sandler is entitled to summary judgment on Staples' breach of contract claims because the agreements forming the basis of Staples' breach of contract claims are unenforceable under Texas law.

Staples claims that Sandler has breached the noncompete agreement Sandler signed when he went to work for Staples.[3] The noncompete agreement that Sandler signed is not ancillary to an otherwise enforceable agreement because it does not obligate Staples in a way that would give rise to a legitimate interest on the part of Staples in restraining Sandler from competing. *Sheshunoff Management Services, L.P. v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006). Neither the noncompete agreement, nor the confidentiality agreement signed by Sandler when he went to work for Staples obligate Staples to provide Sandler with any confidential or proprietary information.[4] The noncompete agreement specifically references the consideration supporting the noncompete:

> NOW, THEREFORE, in consideration of the employment of Employee and compensation and benefits received by Employee from the Company from time to time and the promises and mutual covenants and agreements herein contained, the parties hereto agree as follows:

---

[3]     Plaintiff's Complaint and Application for Permanent Injunction, ¶¶23-27. Staples has sought leave to file its First Amended Complaint, but the allegations against Sandler regarding Staples' breach of contract claim are the same. *See* Plaintiff's proposed First Amended Complaint, ¶¶27-31

[4]     The noncompete agreement and confidentiality agreement by their express terms supersede all previous agreements that Sandler signed when he worked for Prime before Staples acquired Prime. (Defendant's App. 65, 67).

(Defendant's App. 62).  The noncompete does not obligate Staples to provide Sandler with anything.  More importantly, it does not obligate Staples to provide Sandler with confidential and proprietary information, which Sandler in turn agrees to keep confidential.[5]  Without any promises by Staples to provide confidential or proprietary information to Sandler, there can be no otherwise enforceable agreement for Sandler's noncompete agreement to be ancillary to.

Staples also contends that Sandler breached the confidentially and fiduciary duty agreements.  Staples has no evidence that Sandler disclosed any confidential information to anyone.  Sandler has not disclosed to anyone any information he acquired because of his employment at Staples.  No one at Preferred ever asked Sandler if he had confidential or proprietary information belonging to Staples.  When Sandler left Staples, Sandler did not take, and does not have any documents or any other tangible personal property belonging to Staples.

**C.    Staples' Fiduciary Duty Claims**

Staples contends that Sandler breached a contractual fiduciary duty and a common law fiduciary duty to Staples.[6]  However, the only customers that Sandler has contacted on behalf of Preferred are the long-term customers to whom Sandler had sold office supplies while he worked at Johnson Ribbon and Prime.  While at Preferred, Sandler has not sold any office products to any customer that Sandler had not previously done business with for years prior to Sandler going

---

[5]    The Proprietary and Confidential Information Agreement signed by Sandler also does not obligate Staples to provide Sandler with confidential or proprietary information.  According to the consideration recited in the Proprietary and Confidential Information Agreement, the consideration for Sandler's promise of confidentially is his employment, compensation, and benefits, and importantly, not a return promise from Staples to give Sandler confidential and proprietary information.

[6]    Plaintiff's Complaint, ¶¶26, 30-31; Plaintiff's proposed First Amended Complaint, ¶30, 35-36.

to work for Staples.  Sandler has not attempted to make any sales to any customers about whom Sandler gained knowledge because of Sandler's employment at Staples.

When Sandler gave his resignation notice to Staples, Sandler had not decided where he would go to work after his employment at Staples ended.  Since Sandler did not know where he was going to work after he left Staples, Sandler did could not have solicited any business from any Staples customers for Preferred while Sandler was still employed by Staples.  Prior to going to work for Preferred, Sandler did not discuss with anyone at Preferred the customers that Sandler worked with while he was employed by Staples.  Sandler did not discuss with anyone at Preferred the amount of business Sandler thought he could bring with him from Staples.  Sandler did not discuss anyone at Preferred any customers that Sandler thought would follow him to Preferred.

When Sandler gave his resignation notice to Staples, Sandler had not decided where he would go to work after his employment at Staples ended.  Since Sandler did not know where he was going to work after he left Staples, Sandler did could not have solicited any business from any Staples customers for Preferred while Sandler was still employed by Staples.

After going to work for Preferred, Sandler did not use or disclose to anyone any information he acquired because of his employment at Staples.  No one at Preferred ever asked Sandler if he had confidential or proprietary information belonging to Staples.  In fact, the key piece of information that Preferred needs to compete with its competitors is the price the competitors charge the customers.  Customers regularly give out pricing information to try to obtain the best possible price.  More importantly, the customer ultimately decides from whom it is going to purchase office supplies.

In Texas, to resign from one's employment and go into business in competition with one's former employer is, under ordinary circumstances, a constitutional right. *Ledel v. Bill Hames Shows, Inc.*, 367 S.W.2d 182, 184 (Tex.Civ.App.-Fort Worth 1963, no writ). There is nothing legally wrong in engaging in such competition or in preparing to compete before the employment terminates. *M P I, Inc. v. Dupre*, 596 S.W.2d 251, 254 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.). Moreover, the possibility of crippling, or even destroying, a competitor is inherent in a competitive market. *Abetter Trucking Co. v. Arizpe*; 113 S.W.3d 503, 510 (Tex.App.-Houston [1 Dist.] 2003 no writ).

As a former employee, Sandler's duties to Staples are: (1) not to misappropriate the company's trade secrets; (2) not to solicit his employer's customers while still working for his employer; (3) not to solicit the departure of other employees while still working for his employer, and (4) not to carry away confidential information, such as customer lists. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex.2002); *Johnston v. American Speedreading Acad., Inc.,* 526 S.W.2d 163, 166 (Tex.Civ.App.-Dallas 1975, no writ); *Herider Farms-El Paso, Inc. v. Criswell,* 519 S.W.2d 473, 476-77 (Tex.Civ.App.-El Paso 1975, writ ref'd n.r.e.).

Sandler has established that he did not violate any duty that he owed to Staples because of his status as a former employee of Staples.

### D.      Staples' claims for misappropriation of trade secrets.

Staples has claimed that Sandler has misappropriated Staples' confidential information and trade secrets.[7]   However, Sandler has established that he Sandler did not use or disclose to anyone any information he acquired because of his employment at Staples.  Sandler has not sold

---

[7]      Plaintiff's Original Complaint, ¶¶35-36; Plaintiff's proposed First Amended Complaint, ¶¶42-43.

any office products to any customer that Sandler had not previously done business with for years prior to Sandler going to work for Staples.  Sandler has not attempted to make any sales to any customers about whom Sandler gained knowledge because of Sandler's employment at Staples. Sandler did not solicit any business from any Staples customers for Preferred while Sandler was still employed by Staples.  Prior to going to work for Preferred, Sandler did not discuss with anyone at Preferred the customers that Sandler worked with while he was employed by Staples. No one at Preferred ever asked Sandler if he had confidential or proprietary information belonging to Staples.  More importantly, the key piece of information that Preferred needs to compete with its competitors is the price the competitors charge the customers.  Customers regularly give out pricing information to obtain the best possible price, and in any event the price the customer pays is freely available in the marketplace.

The elements of misappropriation of trade secrets are: (1) a trade secret exists; (2) the trade secret was acquired through a confidential relationship; and (3) the defendant used the trade secret without authorization.  *Avera v. Clark Moulding,* 791 S.W.2d 144, 145 (Tex.App.-Dallas 1990, no writ).   Staples has no evidence to support the third element or otherwise contradict Sandler's evidence that he has not used or disclosed any information, let alone trade secrets, to anyone after he left Staples.

### E.	Staples' tortious interference claims.

Staples claims that Sandler tortiously interfered with Staples' contracts and business relationships with Staples' clients.[8]   The elements of tortious interference are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act

---

[8]	Plaintiff's Original Complaint, ¶39; Plaintiff's proposed First Amended Complaint, ¶47.

was the proximate cause of plaintiff's damages; and (4) actual damage or loss. *John Paul Mitchell Sys. v. Randalls Food Markets, Inc.,* 17 S.W.3d 721, 730 (Tex.App.-Austin 2000) (citing *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996)).

Staples has the burden of showing that Sandler acted willfully and intentionally. *COC Servs., Ltd. v. CompUSA, Inc.,* 150 S.W.3d 654, 670 (Tex.App.-Dallas 2004, pet. denied). A willful act involves more than simple participation in some act with a breaching party. *See John Paul Mitchell Sys.,* 17 S.W.3d at 730. The defendant must knowingly induce one of the contracting parties to breach its obligations. *Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex.1993); *John Paul Mitchell Sys.,* 17 S.W.3d at 730 (citing *Davis v. HydPro, Inc.,* 832 S.W.2d 137, 139 (Tex. App .-Eastland 1992, writ denied). Liability for intentional interference may not be based on a simple finding that the defendant performed certain acts; there must be a finding that the defendant performed certain acts with the knowledge or belief that interference with a contract would result from that contract. *See Southwestern Bell Tel. Co. v. John Carlo Texas,* 843 S.W.2d 470, 472 (Tex.1992).

Sandler's summary judgment establishes that one of Sandler's biggest customers told Sandler that it was planning on leaving Staples, regardless of whether Sandler remained employed at Staples. In general, Sandler's customers were not happy with Staples, and Staples cannot show that anything Sandler did proximately caused any customers to take their business from Staples to Preferred. As far as Sandler's customers were concerned, they were not going to remain Staples customers regardless of whether Sandler remained employed at Staples. Moreover, Staples cannot establish that it had any contracts with the customers that Sandler serviced that were capable of being interfered with. Sandler's summary judgment establishes that the customer ultimately decides from whom it is going to purchase office supplies.

Staples cannot establish the first and third elements of its tortious interference claim, and Sandler is therefore entitled to summary judgment.

### F.      Staples' fraud and negligent misrepresentation claim.

Staples appears to be claiming that Sandler acted fraudulently or negligently when Sandler went to work for Staples in March of 2006 because Sandler subsequently quit his job in February 2007.[9]  Sandler's summary judgment evidence establishes that Sandler fully expected to comply with the terms of his employment agreement with Staples at the time Sandler entered into the agreement with Staples.  For several months, Sandler worked for Staples selling office supplies.  By November 2006, it because apparent to Sandler that Staples was not going to fulfill the representations that Staples made to Sandler to induce Sandler to sign the noncompete agreement.  Once Sandler concluded that Staples did not intend to honor its obligations, Sandler decided to quit.

To prove fraud, an essential element to Staples' misrepresentation claim is that Sandler made a false representation to Staples.  To prove a false promise of future performance, Staples must establish that Sandler made a promise with no intention of performing it.  *Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434 (Tex. 1986).  Sandler's continued to work for Staples for 11 months before he quit.  Partial performance of the promise negates any intent that Sandler did not intend to perform at the time Sandler executed the noncompete agreement.  *IKON Office Solutions v. Eifert*, 125 S.W.3d 113, 124 (Tex.App.—Houston [14 Dist.] 2003, pet. denied).  Staples cannot contradict Sandler's summary judgment that Sandler fully intended to comply with the terms of the noncompete agreement and the confidentiality agreement at the time

---

[9]      Plaintiff's Original Complaint, ¶41-42; Plaintiff's proposed First Amended Complaint, ¶¶52-53.

Sandler executed the agreements, which means that Staples cannot establish an essential element of its fraud claim against Sandler.

To prove negligent misrepresentation, Staples must prove that Sandler gave false information without exercising reasonable care. *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999). Sandler's willingness to execute the noncompete agreement and confidentiality agreement was based on specific inducements from Staples. For Sandler to be found to have failed to exercise reasonable care, Staples would necessarily have to concede that it gave false and deceptive information to Sandler to induce Sandler to sign the agreements. As with Staples' fraud claim, Staples cannot show that Sandler made any false representations because Sandler fully expected that his relationship with Staples would be mutually beneficial for both parties.

### G.   Staples' conversion claim.

Staples contends that Sandler converted trade secrets and confidential information that belongs to Staples.[10]   Only tangible property is subject to conversion. Only tangible personal property is subject to a suit for conversion. *See United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 222 (Tex. App.-Waco 1993, writ denied). Trade secrets and confidential information are not tangible property. Moreover, Sandler's summary judgment establishes that he has no tangible property belonging to Staples. On this basis Sandler is entitled to summary judgment on Staples' conversion claim.

---

[10]   Plaintiff's Original Complaint, ¶44; Plaintiff's proposed First Amended Complaint, ¶55.

## CONCLUSION

The noncompete agreement Staples is attempting to enforce against Sandler is unenforceable because it is not ancillary to any otherwise enforceable agreement. Accordingly, it is an illegal restraint on trade under Texas law. Sandler has not used or disclosed to anyone any information he came into possession on account of his employment at Staples. Sandler did not take, and does not have, any tangible personal property belonging to Staples. For these reasons, Sandler is entitled to judgment as a matter of law.

Respectfully submitted,

**DAVID, GOODMAN & MADOLE,**
A Professional Corporation

By:    /S/  Brett Myers
          Brett L. Myers
          State Bar No. 00788101
Two Lincoln Centre
5420 LBJ Freeway, Suite 1200
Dallas, Texas  75240
972/991-0889
972/404-0516 Telecopier

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that December 24, 2007, the foregoing Memorandum in Support of Defendant's Motion for Summary Judgment was filed and served electronically using the Court's ECF filing procedures.

/S/      Brett Myers
          Brett L. Myers